IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| ADRIAN MULDROW, | * |
| Plaintiff, | * |
|  | * |
| v. | *  CIVIL NO.: WDQ-11-0519 |
|  | * |
| SCHMIDT BAKING COMPANY, INC., et al., | * |
|  | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Adrian Muldrow sued Schmidt Baking Company, Inc. ("Schmidt") and Two Farms, Inc., d/b/a Royal Farms Store ("Royal Farms") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII")[1] and related claims. On February 17, 2012, Muldrow and Schmidt stipulated to dismissal of the claims against Royal Farms. ECF No. 45. For the following reasons, the Court will deny Muldrow's cross motion for summary judgment, deny as moot Muldrow's motion to strike exhibits attached to Schmidt's motion for summary judgment, and grant Schmidt's motion for summary judgment.[2]

---

[1] 42 U.S.C. §§ 2000e et seq.

[2] The Court will grant Muldrow's unopposed motion to exceed the page limits for briefs. See ECF No. 50.

I. Background[3]

In March 2006, Schmidt hired Muldrow, an African American male, as "general help." ECF No. 49-3, Ex. 1 at 2 (30:16-18, 31:4-6). In February 2007, he was promoted to "route salesman" for "Route 22." Id. at 3, 6 (35:11-15; 46:14-19). In or about March 2009, Muldrow "bid for" and won, through his Collective Bargaining Agreement ("CBA"), the more lucrative Route 84. Id. at 6 (47:22; 48:1, 9-10, 16-22). Route 84 serviced stores such as Royal Farms, Krauzer Food Store, and Walmart. See generally ECF No. 51, Ex. 1 at 23-24. The Royal Farms account generated about $2 million a year for Schmidt. ECF No. 51, Ex. 5 at 4 (13:3-8).

A. Muldrow's Work History

Between 2008 and 2010, Muldrow received poor performance evaluations[4] from Schmidt at least eight times, including:

- On April 18, 2008, an oral warning for inaccurate counting in his returns, ECF No. 49-10, Ex. 8 at 1;

---

[3] On cross motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003).

[4] Disciplinary action typically progresses, from least to most severe: Verbal [i.e., oral], written, suspension, and termination. ECF No. 51, Ex. 7 at 15 (55:20-21). Certain offenses merit immediate termination. Id. at 15 (57:3-4). See generally ECF No. 51, Ex. 46. Schmidt's Sales Department Rules and Regulations serve as "a basic guide" to common violations and applicable disciplinary responses. Id.

- On January 3, 2009, a written warning for leaving a customer's order outside the store with a note saying "I waited as long as I could," *id.* at 2;[5]

- On May 26, 2009, a Letter of Concern for failing to follow management instructions regarding the set-up of displays in the stores on his route, *id.* at 3;

- On August 4, 2009, a written warning for untimely service and incomplete deliveries, *id.* at 4;

- On August 6, 2009, a Letter of Concern for leaving a message instead of speaking to a manager when calling out for the rest of the week, in violation of the callout policy, *id.* at 5;[6]

- On September 19, 2009, counseling on the importance of entering accurate figures in his handheld scanning device, *id.* at 6;

- In November 2009, a three-day suspension for poor job

[5] Muldrow testified that Schmidt employees leave orders outside "all the time" so that they can service other stops.  ECF No. 49-3, Ex. 1 at 5 (44:17-22).

[6] "Callout policy" refers to a company's rules for reporting employee lateness and absence.  *See, e.g.*, *Prof'l Recovery Servs., Inc. v. Gen. Elec. Capital Corp.*, 642 F. Supp. 2d 391, 397 (D.N.J. 2009); *Martin v. Brown*, No. 89-2362, 1990 WL 48441, at *2 (E.D. Pa. Apr. 18, 1990).  Muldrow testified that, after learning about a family member's death, he "followed the [callout] procedure" by calling his supervisor Gary Engler and North East Depot Branch Manager Jodi Sprenkle, but "[n]obody answered their phone[s]."  *See* ECF No. 49-3, Ex. 1 at 7 (52:14-22; 53:1-16).

performance relating to "excessive" off-code product,[7]
"failing to follow a management directive," "improper
merchandising," and "falsifying company documents," *id.* at
7;[8] and

- On January 30, 2010, an oral warning for inaccurate
  ordering, *id.* at 9.

Muldrow was charged with additional infractions in the
month before his termination.  On April 29, 2010, Project Sales
Manager Andrew Zinkand emailed North East Depot Branch Manager
Jodi Sprenkle to notify her that Muldrow had delivered products
to Royal Farms Store No. 15 at 4:15 a.m., in violation of the
store policy prohibiting delivery before 6 a.m.  ECF No. 49-18,
Ex. 16.[9]  Zinkand wrote that Muldrow had been reprimanded before
for the same violation and stated that, "Next time he gets there
before 6 he is history."  *Id.*  Sprenkle replied: "your [sic]
right, i'm replacing him anyway, he's to [sic] much work."  *Id.*
On May 3, 2010, Zinkand emailed Sprenkle again after Muldrow was

---

[7] "Off-code product" apparently refers to Muldrow's having
delivered significantly more items than a customer had ordered.
*See* ECF No. 49-10, Ex. 8 at 7 (reprimand form identifies "70
pieces" as "excessive off code").

[8] Sprenkle "seriously considered" terminating Muldrow for these
infractions, but "elected to give him another chance and to
suspend him instead."  ECF No. 49-12, Ex. 10 at 1; *see also* ECF
No. 49-11, Ex. 9.

[9] Muldrow testified that he was "not familiar" with that policy
and that he was trained to arrive before 6:00 a.m. by a Schmidt
employee named "Sam."  ECF No. 51, Ex. 1 at 19 (73:2-14).

allegedly caught signing his own delivery ticket.   ECF No. 49-19, Ex. 17.[10]

  B. May 4, 2010

    1. The Incident at Royal Farms Store No. 15

    Muldrow entered Royal Farms Store No. 15 at about 9:30 a.m. on May 4, 2010.   ECF No. 51, Ex. 1 at 69 (272:17-19).   After conducting routine maintenance, Muldrow waited in the check-in area for a manager to sign off on his delivery.   *Id.* at 69, 70, 73 (272:20-22; 273:1-6; 275:2-9; 287:19-21).   Muldrow testified that Selina Windsor, the store's deli manager, approached him with "an aggressive and disrespectful attitude, menacing look and snarling tone," and asked who he was and why he was there. *Id.* at 67 (262:13-16).   Muldrow gave his employer's name and asked her to check in the inventory, sign his invoice, and help him purchase a money order.   *Id.* at 67 (263:18-21).   Windsor "snatched" the invoice ticket from Muldrow, at which point Muldrow asked Windsor to "interact with him in a more professional manner."   *Id.* at 67 (264:7-8).   Windsor informed Muldrow that she would be issuing him a vendor violation[11] for

---

[10] Falsifying documents was grounds for immediate termination. ECF No. 49-10, Ex. 8 at 7.

[11] According to Sprenkle, a vendor violation is when "[a] Schmidt employee would come into a Royal Farms and violate one of their policies."   ECF No. 51, Ex. 4 at 9 (32:1-4, 13-16).   A route salesman who received three vendor violations from the same

5

having delivered extra products. *Id.* at 73 (289:10-12).[12]

After Windsor returned with the vendor violation, ECF No. 51, Ex. 1 at 73, 74 (289:10-12; 290:5-7), Muldrow testified, her attitude had "worse[ned]." *Id.* at 74 (291:1-2). Muldrow asked her again not to treat him disrespectfully. *Id.* at 74 (291:1-5). Windsor allegedly "exploded," in a "loud and embarrassing tone": "Who the fuck does this nigger think he's talking to? I'm not checking in this nigger," and left. *Id.* at 67 (265:3-8).[13] Store manager Patricia Cremona approached Muldrow to ask what had happened. *Id.* at 74 (291:11-18). He told her, and she gave him Royal Farms's corporate number so that he could file a report. *Id.* Cremona then assisted Muldrow with checking in his

---

store would be "thrown out" of the account and "in most cases" terminated. ECF No. 51, Ex. 5 at 8 (28:4-11).

[12] Windsor called Zinkand—who was in charge of Royal Farms's account—around 10:00 a.m. to notify him that she had argued with Muldrow about his invoice and that she would be issuing Muldrow a vendor violation. ECF No. 49-4, Ex. 2 at 6; ECF No. 51, Ex. 5 at 9 (31:10-21; 32:1-4). Zinkand called Sprenkle "within the half hour, hour" to "let [her] know there was a problem." ECF No. 51, Ex. 5 at 10 (34:2-8).

[13] Royal Farms employee Carrie Jarvis, who witnessed the exchange, testified that Windsor had called Muldrow a "nigger." ECF No. 51, Ex. 3 at 3 (9:10-14). Jarvis's testimony differed from an earlier written statement regarding the interaction. *Id.* at 6 (21:13-21; 22:1-11). Jarvis explained that her initial statement "left out a lot of details" because "[w]e were not allowed to write hearsay. . . . I'm not allowed to write nothing down like that because it makes Royal Farms look bad." *Id.* at 6 (22:7-11).

inventory.  *Id.* at 75 (294:5-6).[14]

2. Muldrow's Conversations with Schmidt Employees

Muldrow called Sprenkle at 10:08 a.m.  ECF No. 49-3, Ex. 1 at 13 (117:8-22).  Muldrow explained the situation to Sprenkle, but she was unable to respond; the call was lost, because of poor reception, after two minutes.  *Id.* at 13, 14 (117:8-22; 118:6-10); ECF No. 49-21, Ex 19.  Sprenkle heard that Muldrow was upset because "he had [had] an argument with an assistant manager at Royal Farms."  ECF No. 49-12, Ex. 10 at 2.  Sprenkle did not hear that Muldrow had been called a "nigger."  *Id.*

Between 10:10 and 10:23 a.m., Muldrow called the Royal Farms corporate office and left messages.  ECF No. 49-21, Ex. 19.  At 10:41 a.m., Muldrow reported the incident to Michael Halager, Schmidt's Sales Supervisor.  *Id.*; ECF No. 51, Ex. 1 at 33 (126:5-9).  At 10:54 a.m., Royal Farms returned Muldrow's call and took his formal complaint.  ECF No. 49-21, Ex. 19; ECF No. 51, Ex. 1 at 77 (303:7-9).

3. Zinkand's Investigation of Muldrow's Complaint

Sometime "later that morning,"[15] after Windsor had reported the vendor violation to Zinkand, Zinkand learned of Muldrow's

---

[14] According to Cremona, Muldrow told her that he "did not like the way that Ms. Windsor [had] spoke[n]" to him.  ECF No. 49-15, Ex. 13 at 2.  Muldrow did not mention any use of racial epithets to Cremona.  *Id.*  After learning that Windsor had informed the corporate office of his vendor violation, Muldrow told Cremona, "If she can lie, so can I lie."  *Id.*

allegations against Windsor from Katherine ("Kitty") Fields,
Royal Farms's Employee Relations Leader. ECF No. 49-4, Ex. 2 at
20; ECF No. 51, Ex. 5 at 10 (34:19-20). Zinkand notified
Sprenkle. ECF No. 49-5, Ex. 3 at 5; ECF No. 51, Ex. 4 at 12
(42:7-10, 18-21). Sprenkle told Zinkand that she intended to
fire Muldrow because they had had "problems" over the past week.
ECF No. 49-5, Ex. 3 at 5.[16] Between 11:00 a.m. and 1:00 p.m.,
Zinkand also called Sharon Crispens, Schmidt's Director of Human
Resources. ECF No. 49-4, Ex. 2 at 9-10. Crispens asked Zinkand
to investigate and "get some written documentation from each
employee." ECF No. 49-6, Ex. 4 at 5.

Zinkand arrived at Royal Farms Store No. 15 between 1:30
and 2:00 p.m. ECF No. 49-4, Ex. 2 at 12. He spoke to Windsor
and Cremona. *Id.* at 12, 19, 24. Both told Zinkand that Muldrow
became angry after Windsor told him she would be issuing a
vendor violation. *Id.* at 12-13. Windsor denied having called
Muldrow a "nigger." *Id.* at 13.

Zinkand also visited Royal Farms Store No. 29, where
Muldrow had allegedly falsified a ticket the day before. *See*

---

[15] Neither party has provided a clear sequence of the phone calls
between Schmidt and Royal Farms employees on May 4, 2010.

[16] It is unclear when Sprenkle made this statement. Zinkand
agrees that Sprenkle told him she planned to suspend Muldrow in
"one of the[ir] conversations" that morning. ECF No. 49-4, Ex.
2 at 20. Sometime "before lunch," Sprenkle also told Richard
Lewis, the union shop steward, that she intended to fire
Muldrow. ECF No. 49-5, Ex. 3 at 7.

ECF No. 49-4, Ex. 2 at 14.  Zinkand met with store manager
Barbara Smallwood, *id.*, who showed him a copy of the ticket and
told him that she had not signed it, as she was not in the store
that day.  ECF No. 49-16, Ex. 14 at 2.  Smallwood told Zinkand
that none of her employees had signed the ticket.  ECF No. 51,
Ex. 5 at 13 (47:20-21).  Zinkand noticed that the store needed
service, despite Muldrow having been there that morning.  *See*
ECF No. 49-30, Ex. 28 at 1.  Zinkand then emailed Crispens about
the witness statements he had obtained.  ECF No. 49-32, Ex. 30.[17]

    4. The Meeting

    While Zinkand investigated Muldrow's claims, Muldrow and
Lewis met with Sprenkle at the Schmidt depot.  ECF No. 49-3, Ex.
1 at 17 (147:8-14).  Sprenkle informed Muldrow that he was being
suspended.  *Id.; see also id.* at 18 (151:13-15).[18]  Lewis then
asked Muldrow what had happened that morning.  *Id.* at 35 (385:7-
12).  After Muldrow explained, Lewis asked Sprenkle why Muldrow
was being suspended.  *Id.* at 35 (385: 14-16).  She responded
that the decision had come from "Corporate."  *Id.* at 35 (385:16-

---

[17] Zinkand did not take a statement from Muldrow.  ECF No. 51,
Ex. 5 at 15 (57:12-14).  Zinkand testified: "when you're in
marketing if you do your investigation you're done.  You forward
it to HR and the branch manager . . . that's when they do their
job."  *Id.* at 15 (57:4-18).

[18] According to Muldrow, Sprenkle stated that his complaint
against Windsor had "started a forest fire around the office."
Compl. ¶ 24.  Sprenkle denies having said this.  ECF No. 49-5,
Ex. 3 at 9.

17).  Lewis told Sprenkle to call Corporate.  *Id.* at 36 (386:20-21).  Sprenkle called Crispens.  *Id.*  According to Muldrow, who was within arms-length of Sprenkle, Sprenkle asked Crispens, "What am I to do with this?"  *Id.* at 36 (386:9-11; 387:20-21).  Crispens allegedly responded, "I don't know.  Find something."[19]  *Id.* at 36 (388:2).  Sprenkle hung up the phone and asked Muldrow and Lewis to leave the office.  *Id.* at 36 (388:12-13).[20]

Crispens and Sprenkle concluded that, despite Muldrow's allegations against Windsor, suspension pending termination was appropriate "based on his repeated poor performance."  ECF No. 49-14, Ex. 12 at 2.[21]  Sprenkle then told Muldrow that he was being suspended pending termination for "poor performance."  ECF No. 49-3, Ex. 1 at 18 (151:13-15); *see supra* Part I.A.  Sprenkle also gave Muldrow a written reprimand form, which he signed.

---

[19] Crispens denies having made this statement and neither Lewis nor Sprenkle heard it.  *See* ECF No. 49-14, Ex. 12 at 1; ECF No. 49-7, Ex. 5 at 4; ECF No. 49-12, Ex. 10 at 3.  Muldrow did not include the statement in his filings with the Equal Employment Opportunity Commission, in which he described the meeting.  *See generally* ECF No. 49-25, Ex. 23.

[20] After Muldrow left Sprenkle's office, he called Crispens to explain what had happened to him.  ECF No. 49-3, Ex. 1 at 16 (145:6-14).  Muldrow testified that Crispens was "evasive" and did not give him any advice.  *Id.*

[21] There is conflicting testimony about whether Schmidt terminated Muldrow because of his history of infractions or because of the alleged violations on April 29 and May 3, 2010.  *See supra* Part I.A.  For instance, Sprenkle testified that "I was going to terminate [Muldrow] [on May 4] because we had issues over the past week."  ECF No. 49-5, Ex. 3 at 5.

ECF No. 49-3, Ex. 1 at 19, 20 (157:20-22; 158:1-3).

C. Procedural History

Muldrow filed a grievance of his suspension, as authorized by his CBA. ECF No. 49-3, Ex. 1 at 20 (161:10-12). Crispens, Sprenkle, Lewis, and Union representative Gary Oskoian joined Muldrow at the hearing, which was held at North East Depot on May 17, 2010. *Id.* at 20 (161:15-18). The hearing lasted about five minutes. *Id.* at 21 (162:3-4). Muldrow was terminated the same day. *See* ECF No. 51, Ex. 10 at 13.

Muldrow's routes were assigned to Scott Kalman, a Caucasian employee. ECF No. 51, Ex. 9 at 5. Kalman had been a Schmidt employee since 2007. ECF No. 51, Ex. 27. Between 2008 and 2010, Kalman had received negative feedback from Schmidt at least six times, including:

- On August 28, 2008, an oral reprimand for failing to follow a management directive to "pull the route out" of the depot at the designated time, ECF No. 51, Ex. 22;

- On September 2, 2008, an oral reprimand for failure to service a customer, ECF No. 51, Ex. 24;

- On November 24, 2009, an oral reprimand for excessive returns, ECF No. 51, Ex. 21;

- On October 7, 2010, an oral reprimand for erratic driving, ECF No. 51, Ex. 20; and

11

- On October 7, 2010, a Letter of Concern for referring to a
  Royal Farms manager as a "Queer ass" and making other
  antigay remarks to a Royal Farms employee,[22] *see* ECF No. 51,
  Ex. 19; *see also* ECF No. 51, Ex. 5 at 22 (84:15-20).[23]

On May 6, 2010, Muldrow filed a complaint against Schmidt
and Royal Farms with the Equal Employment Opportunity Commission
(the "EEOC") for race discrimination and retaliation.[24]   ECF No.
49-22, Ex. 20 at 2, 4, 5.   On February 25, 2011, Muldrow sued
the Defendants for violations of Title VII and related claims.
ECF No. 1.   On April 14, 2011, Schmidt moved to dismiss four of
Muldrow's claims.[25]   ECF No. 9.   On April 20, 2011, while the

---

[22] Sexual harassment was grounds for immediate termination under
Schmidt's Sales Department Rules and Regulations. *See* ECF No.
51, Ex. 46 at 2 (¶ 24).

[23] Zinkand did not investigate Kalman's use of the term "queer."
ECF No. 51, Ex. 5 at 23 (86:8-10). He testified: "If I remember
the email, just the way the whole thing went down it just
sounded like it was horseplay more than anything." *Id.* at 23
(86:20-21; 87:1-2).
   Muldrow alleges that Kalman committed additional violations
in October 2008 (entering false numbers into his hand-held
device), and in or about February 2010 (misappropriating Schmidt
funds for his personal use). ECF No. 51 at 23-24. Muldrow
cites Exhibit 25 for the first allegation, but that exhibit
refers to Kalman's August 28, 2008 oral reprimand. ECF No. 51,
Ex. 25. Muldrow cites his deposition testimony for the second
allegation. ECF No. 51, Ex. 1 at 41 (159:12-22; 160:1-22;
161:1-9).

[24] The parties have not provided details of the EEOC investiga-
tion.

[25] ECF No. 9. Schmidt moved to dismiss Counts IV through VII,
which alleged hostile work environment and wrongful termination

motion to dismiss was pending, Royal Farms filed its answer.
ECF No. 13.

On June 30, 2011, the Court granted in part and denied in
part Schmidt's motion to dismiss. ECF No. 19. The Court denied
the motion as to Count IV (hostile work environment) but
dismissed Counts V through VII (wrongful termination, civil
conspiracy, and conspiracy to interfere with civil rights). *Id.*
On August 24, 2011, Royal Farms moved to dismiss Count X.[26]  On
September 12, 2011, Muldrow opposed that motion. ECF No. 26.
On September 26, 2011, Royal Farms filed a reply. ECF No. 29.
On February 1, 2012, the Court granted Royal Farms's motion to
dismiss Count X. ECF No. 44. On February 17, 2012, Muldrow and
Schmidt stipulated to the dismissal, with prejudice, of
Muldrow's claims against Royal Farms. ECF No. 45.

On March 2, 2012, Schmidt moved for summary judgment. ECF
No. 49. On March 19, 2012, Muldrow moved for leave to exceed
the page limits for briefs. ECF No. 50. Also on March 19,
Muldrow filed a cross motion for summary judgment and in
opposition to Schmidt's motion. ECF No. 51. On March 21, 2012,
Muldrow moved to strike certain exhibits attached to Schmidt's

---

under Title VII, civil conspiracy, and conspiracy to interfere
with civil rights under 42 U.S.C. § 1985. *See id.*; ECF No. 1 at
15-21.

[26] Count X alleged that Royal Farms had conspired to violate
Muldrow's civil rights, in violation of 42 U.S.C. § 1985. ECF
No. 1 at 23; ECF No. 25.

motion for summary judgment.   ECF No. 52.   On April 5, 2012,

Schmidt opposed Muldrow's cross motion for summary judgment and

replied in further support of its motion.   ECF No. 54.   On April

9, 2012, Schmidt opposed Muldrow's motion to strike.   ECF No.

55.   On April 25, 2012, Muldrow replied in further support of

its motion to strike.   ECF No. 56.   On April 26, 2012, Muldrow

replied in further support of its cross motion for summary

judgment.   ECF No. 57.

II. Analysis

   A. Standards of Review

      1. Motion to Strike

      An affidavit or declaration used to support or oppose a

motion must "be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."   Fed.

R. Civ. P. 56(c)(4).[27]   "Thus, a court may strike portions of

affidavits that lack personal knowledge, contain hearsay, or

rest upon conclusory statements."   *Contracts Materials*

*Processing, Inc. v. Kataleuna GmbH Catalysts*, 164 F. Supp. 2d

520, 527 (D. Md. 2001) (*citing Evans v. Technologies*

---

[27] Subdivision (c)(4), which "carries forward some of the
provisions of former subdivision (e)(1)," omits the requirement
that a sworn or certified copy of a paper referred to in an
affidavit or declaration be attached to the affidavit or
declaration.   Fed. R. Civ. P. 56 advisory committee's note.
Instead, subdivision (c)(1)(A) requires that a statement or
dispute of fact be supported by materials in the record.   *Id.*

*Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)).

"Hearsay" is an out-of-court statement offered into evidence to

prove the truth of the matter asserted therein.   Fed. R. Evid.

801(c).

   2. Summary Judgment

   The Court "shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."   Fed. R.

Civ. P. 56(a).[28]   In considering the motion, the judge's function

is "not . . . to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for

trial."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986).   A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict

for the nonmoving party."   *Id.* at 248.

   The Court must "view the evidence in the light most

favorable to . . . the nonmovant and draw all reasonable

inferences in [its] favor," *Dennis v. Columbia Colleton Med.*

*Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court

must abide by the "affirmative obligation of the trial judge to

prevent factually unsupported claims and defenses from

---

[28] Rule 56(a), which "carries forward the summary-judgment stan-
dard expressed in former subdivision (c)," changed "genuine
'issue' [to] genuine 'dispute,'" and restored the word "'shall'
. . . to express the direction to grant summary judgment."   Fed.
R. Civ. P. 56 advisory committee's note.

proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

When cross motions for summary judgment are filed, "each motion must be considered individually, and the facts relevant to each must be reviewed in the light most favorable to the nonmovant." *Mellen*, 327 F.3d at 363 (*citing Rossignol v. Voohaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

B. Muldrow's Motion for Summary Judgment

1. Disparate Treatment: Counts I and III[29]

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 protects the equal right of all persons to "make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).

Muldrow argues that he is entitled to summary judgment on his disparate treatment claims because there is direct evidence of discrimination or, in the alternative, because he has carried

---

[29] Counts I and III of Muldrow's Complaint allege race-based disparate treatment under Title VII and § 1981.  ECF No. 1. Title VII and § 1981 discrimination are analyzed within the same legal framework.  Therefore, the Court will analyze these claims together.  *Lightner v. City of Wilmington*, 545 F.3d 260, 263 n.* (4th Cir. 2008) (*citing Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004)); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004).

his burden of persuasion under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[30]  *See* ECF No. 51 at 28.  Muldrow has not submitted direct evidence of racial discrimination.[31]  Further, Muldrow has not established a prima facie case of discrimination, because he has not shown that his job performance was satisfactory to Schmidt.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir. 1989); *see infra* Part II.C.1.b.i.  Nor has Muldrow rebutted Schmidt's legitimate, nondiscriminatory reasons[32] for his termination.  Thus, Muldrow's motion for

---

[30] Under the burden-shifting approach of *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination.  *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997), *overruled on other grounds by Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999).  If he does, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004).  If the defendant succeeds, the burden returns to the plaintiff to prove, by a preponderance of the evidence, that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Reeves*, 530 U.S. at 143 (internal quotation marks omitted).  These "shifting intermediate evidentiary burdens . . . expedite the process of [a] plaintiff's proof."  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989).  However, the "ultimate burden of persuasion" in a Title VII or § 1981 employment discrimination case remains at all times with the plaintiff.  *Id.*

[31] Muldrow argues that Schmidt's final decision to fire him "once [Sprenkle] learned" of his complaint against Windsor is direct evidence of discrimination.  ECF No. 51 at 28.  Muldrow is incorrect, *see infra* Part II.C.1.a.

[32] Schmidt has proffered a legitimate, nondiscriminatory reason for Muldrow's termination: several poor performance evaluations between 2008 and 2010.  *See generally* ECF No. 49-10, Ex. 8.

summary judgment on Counts I and III will be denied.

2. Retaliation: Count II

Title VII makes it unlawful for an employer to "discrimi-
nate against any of [its] employees . . . because [the employee]
has opposed any practice made an unlawful employment practice by
[Title VII], or because [the employee] has made a charge . . .
or participated in any manner in an investigation, proceeding,
or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).

Muldrow argues that he is entitled to summary judgment on
his retaliation claim because he has established a prima facie
case of retaliation and shown that Schmidt's proffered reasons
for his termination are "a sham." *See generally* ECF No. 51 at
60-72.  Muldrow has established a prima facie case of
retaliation because he engaged in a protected activity and was
then terminated. *See Okoli v. City of Baltimore*, 648 F.3d 216,
223 (4th Cir. 2011).[33]  However, Muldrow has not rebutted
Schmidt's legitimate, nondiscriminatory reasons for his

---

Muldrow argues, *inter alia*, that Schmidt's explanation is
"wholly incredible" and "unworthy of belief." *See generally* ECF
No. 51 at 28-59.  As discussed in Part II.C.1.c, Muldrow has not
submitted evidence sufficient to prove such allegations.

[33] *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (*citing
Williams*, 871 F.2d at 457 ("While this proof far from
conclusively establishes the requisite causal connection, it
certainly satisfies the less onerous burden of making a prima
facie case of causality.")); *see also infra* Part II.C.2.a.

termination.[34]   Muldrow's motion for summary judgment on Count II
will also be denied.

    3. Hostile Work Environment: Count IV

    Title VII makes it unlawful for an employer to "discharge
any individual, or otherwise to discriminate against any
individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's race."
42 U.S.C. § 2000e-2(a)(1).  "Since an employee's work environ-
ment is a term or condition of employment, Title VII creates a
hostile working environment cause of action."  *EEOC v. R&R
Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

    Muldrow argues that he is entitled to summary judgment on
Count IV because he has established a prima facie case of a
racially hostile work environment.  *Spriggs v. Diamond Auto
Glass*, 242 F.3d 179, 184 (4th Cir. 2001).  *See generally* ECF No.
51 at 80-87.  As discussed in Part II.C.3, there is a genuine
dispute of material fact as to whether Windsor's harassment was

---

[34] Schmidt identifies several poor performance evaluations
between 2008 and 2010 as a legitimate, nondiscriminatory reason
for Muldrow's termination.  *See generally* ECF No. 49-10, Ex. 8.
Muldrow argues that he has shown pretext because Zinkand's
investigation into his complaint was "a sham."  ECF No. 51 at
66-73.  He asserts that the investigation was not conducted at
Schmidt's request, that Zinkand never interviewed Muldrow, and
that Zinkand's loyalties were "blatantly tied to maintaining
service to the customer [Royal Farms] as opposed to preventing
discrimination in the workplace."  *Id.* at 66-72.  But the record
reflects that Zinkand's investigation was undertaken in good
faith, *see infra* Part II.C.2.b.

severe.[35]   But Muldrow has not shown that the harassment is imputable to Schmidt--the record reflects that Schmidt conducted a good faith, nonnegligent inquiry into the alleged incident.[36] Muldrow's motion for summary judgment on Count IV will be denied.

C. Schmidt's Motion for Summary Judgment[37]

1. Disparate Treatment: Counts I and III

To survive an employer's motion for summary judgment, a plaintiff must show direct evidence of discrimination, or establish a prima facie case that raises an inference of illegal

---

[35] According to Muldrow, Windsor "exploded," in a "loud and embarrassing tone": "Who the fuck does this nigger think he's talking to? I'm not checking in this nigger." ECF No. 51, Ex. 1 at 67 (265:3-8). Muldrow further alleges that Windsor refused to help him with his inventory, which interfered with his work performance. *See, e.g., id.* at 68 (269:4-11). Windsor denied having called Muldrow a "nigger." ECF No. 49-4, Ex. 2 at 13.

[36] *EEOC v. Cromer Food Servs., Inc.*, Nos. 10-1476, 10-1552, 2011 WL 733814, at *4 (4th Cir. Mar 3., 2011); ECF No. 49-4, Ex. 2 at 12, 19, 24; *see also infra* Part II.C.3.

[37] Muldrow has moved to strike portions of 11 exhibits attached to Schmidt's motion on the grounds of defectiveness and hearsay. ECF No. 52 at 10-11. Because the Court did not rely upon the contested evidence in reaching its decision, Muldrow's motion will be denied as moot. *See, e.g., Trotter v. Kennedy Krieger Inst., Inc.*, No. 11-3422-JKB, 2012 WL 3638778, at *5 (D. Md. Aug. 22, 2012) (plaintiff's motion to strike moot when the court did not consider the evidence in deciding the defendants' motions); *accord Three Lower Counties Cmty. Health Servs., Inc. v. Md. Dep't of Health & Mental Hygiene*, Nos. WMN-10-2488, AMD-05-1280, 2011 WL 3740781, at *6 n.14 (D. Md. Aug. 23, 2011).

conduct.[38]  If the plaintiff succeeds in establishing a prima

facie case under the burden-shifting approach of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), the burden shifts

to the defendant to articulate a legitimate, lawful reason for

its actions.[39]  If the defendant does so, the burden returns to

the plaintiff, who must "establish[] that the employer's

proffered explanation is pretext."[40]

Schmidt argues that Muldrow cannot prove a prima facie case

of discrimination or overcome Schmidt's legitimate, nondiscrimi-

natory business reasons for his termination.  ECF No. 49-1 at

21-28.  Muldrow argues that he has provided direct evidence of

discrimination.  ECF No. 51 at 28.  In the alternative, Muldrow

contends that he has satisfied the burden-shifting approach by

establishing a prima facie case of discrimination and by showing

that Schmidt's proffered reasons for his termination are "wildly

inconsistent," "wholly incredible," and "unworthy of belief."

*See generally id.* at 28-59.

---

[38] *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir.
2010); *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d
310, 318 (4th Cir. 2005).

[39] *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011); *EEOC
v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005).

[40] *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011)
(internal quotation marks omitted).

a. Direct Evidence of Discrimination

A plaintiff can survive an employer's motion for summary judgment by showing direct evidence "of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks omitted).[41]  "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Id*. Schmidt argues that Muldrow has not "brought forward or even alleged any direct evidence of discriminatory conduct by Schmidt." ECF No. 54 at 7.  Muldrow counters that Schmidt's final decision to fire him "once [Sprenkle] learned" of his complaint against Windsor is direct evidence of discrimination.  ECF No. 51 at 28.

Muldrow has not offered evidence "of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on [his termination]."  435 F.3d at 520. That Muldrow was terminated after filing a complaint is not, standing alone, direct evidence that his complaint caused the termination.  Similarly, there is no evidence that Schmidt's

---

[41] *Warch* arose under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq*.  435 F.3d at 513.  Age and race discrimination claims are analyzed within the same framework--by direct evidence or circumstantial evidence under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1314 (4th Cir. 1993).

decision to terminate Muldrow was racially motivated.
Therefore, Muldrow must proceed under the *McDonnell Douglas*
burden-shifting approach.   *See* 411 U.S. at 802-04.

b. Prima Facie Case

To establish a prima facie case of racial discrimination
under either Title VII or § 1981, a plaintiff must show: (1)
"membership in a protected class," (2) "satisfactory job
performance," (3) "adverse employment action," and (4) that
similarly situated employees outside the protected class
"received more favorable treatment."   *White v. BFI Waste Servs.,
LLC*, 375 F.3d 288, 295 (4th Cir. 2004); *Williams*, 871 F.2d at
455.   Schmidt argues that Muldrow cannot show satisfactory job
performance or that a similarly situated employee outside his
protected class was treated more favorably.   ECF No. 49-1 at
21.[42]   Muldrow objects that he was performing his job duties "at
a level that met and/or exceeded his employer's legitimate
expectations," and that his route was assigned to a similarly
qualified, Caucasian applicant.   ECF No. 51 at 32-35.

i. Satisfactory Job Performance

"Considering an employer's legitimate expectations comports
with the purpose of requiring the establishment of a prima facie
case . . . to eliminate the most common, nondiscriminatory

---

[42] Schmidt concedes that Muldrow belonged to a protected class
and was subject to an adverse employment action.   ECF No. 49-1
at 21.

reasons for the employer's conduct." *Warch*, 435 F.3d at 514. "Whe[n] . . . an employer fires an employee, the employer is more likely focused on . . . aspects of the employment [other than qualifications], such as poor job performance or infractions of company rules." *Id.* In such cases, the prima facie case "requires the employee to demonstrate that he was 'qualified' in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Id.* at 514-15 (internal quotation marks omitted).

Schmidt has submitted evidence that Muldrow received poor performance evaluations at least eight times between 2008 and 2010 in his position as route salesman.[43]  Further, Muldrow was

---

[43] These included: (1) An oral warning for inaccurate counting in his returns, (2) a written warning for leaving a customer's order outside the store, (3) a Letter of Concern for failing to follow management instructions regarding the set-up of displays, (4) a written warning for untimely service and incomplete deliveries, (5) a Letter of Concern for leaving a message instead of speaking to a member of management when calling out for the rest of the week, (6) counseling on the importance of entering accurate figures in his handheld scanning device, (7) a three-day suspension for poor job performance relating to "excessive" off-code product, "failing to follow a management directive," "improper merchandising," and "falsifying company documents," and (8) an oral warning for inaccurate ordering. *See generally* ECF No. 49-10, Ex. 8.

Muldrow argues that his prior violations are irrelevant to the question of whether he was performing satisfactorily "at the time of" his termination. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); ECF No. 51 at 36. In support, Muldrow cites *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 547 (4th Cir. 1995) ("The 1990 review of 1989, 1989

charged with two infractions in the month before his
termination: early delivery on April 29, and falsification of a
delivery ticket signature on May 3.  ECF No. 49-18, Ex. 16; ECF
No. 49-19, Ex. 17.  Schmidt expressed an intent to terminate
Muldrow after the April 29 violation.  ECF No. 49-18, Ex. 16.
Muldrow argues that his year-to-date sales numbers showed that
his route was more profitable on May 4, 2010 than it was the
year before; that his sales were "up" in Walmart and Food Lion;
and that he was generally doing "pretty good."  ECF No. 51 at
32.  Muldrow cites his own deposition and exhibits showing that
his route was profitable and that a member of a Food Lion
grocery department was "extremely pleased" with his performance.
*See id.* (*citing* ECF No. 51, Exs. 44, 45).[44]

   "[A plaintiff's] own testimony, of course, cannot establish
a genuine issue as to whether [he] was meeting [his employer's]

---

bonus, [and] salary data . . . are irrelevant because O'Connor
was not performing well [at] the time of termination."), *rev'd
on other grounds*, 517 U.S. 308 (1996).  However, more recent
caselaw rejects the position that only violations committed
immediately before termination may be considered in the
"satisfactory performance" inquiry.  *See Warch*, 435 F.3d at 516-
17 (recognizing that a "long string of performance problems" can
lead to termination and discussing such problems in that case).

[44] Muldrow also challenges the significance of the vendor viola-
tion he received on May 4 at Royal Farms Store No. 15.  ECF No.
51 at 32.  A Schmidt employee's receipt of a vendor violation
does not generally lead to disciplinary action by Schmidt.  *See*
ECF No. 51, Ex. 6 at 8 (26:2-21; 27:1-10).  Muldrow concludes
that Windsor's violation on May 4 cannot support Schmidt's
argument that he was unsatisfactorily performing.

expectations."[45]   Muldrow's belief that he was performing
satisfactorily at the time of termination cannot overcome
Schmidt's evidence that he was not.   328 F.3d at 149.   That
isolated vendor violations do not lead to disciplinary action is
immaterial: the record reflects that Muldrow was charged with a
broad variety of infractions while employed as a route salesman.
ECF No. 49-10, Ex. 8; ECF No. 49-18, Ex. 16; ECF No. 49-19, Ex.
17.

Although Schmidt is "free to assert" that the job
expectation prong has not been met, "nothing prohibits [Muldrow]
from countering this assertion with evidence that demonstrates .
. . that the proffered 'expectation' is not, in fact, legitimate
at all."   *Warch*, 435 F.3d at 517.   Muldrow argues that the April
29 early delivery violation is "contrived," based on Schmidt's
failure to "produce a scintilla of admissible evidence" that
Muldrow had violated this policy before or that such a policy
existed at all.   ECF No. 51 at 37.   Muldrow also argues that the
allegation of ticket falsification on May 3 is a "sham."   *Id.* at
41.   Muldrow emphasizes the store manager's incorrect recollect-
tion that the falsified signature read "Barb," when in fact it
read "B."   *Id.* at 39-40.   Finally, Muldrow challenges "[a]ll
other" alleged performance infractions because they "were not

---

[45] *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (*citing
Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954,
960-61 (4th Cir. 1996)).

presented to Plaintiff, and were not terminable." *Id.* at 41.

Muldrow's argument does not raise a genuine dispute of material fact. The record reflects, and Muldrow was directly told, that he was suspended on May 4 for "poor performance." ECF No. 49-3, Ex. 1 at 18 (151:13-15); *see supra* Part I.A. Sprenkle's testimony that "I was going to terminate [Muldrow] [on May 4] because we had issues *over the past week*," ECF No. 49-5, Ex. 3 at 5 (emphasis added), is not to the contrary. Sprenkle testified that Muldrow's alleged infractions on April 29 and May 3 were a factor in Schmidt's decision to terminate Muldrow. Her statement does not suggest that those infractions were the sole grounds for Schmidt's ultimate decision. Muldrow cannot dispute that he received at least eight formal and informal reprimands while employed as a route salesman. *See generally* ECF No. 49-10, Ex. 8.[46] Although he argues that the infractions were individually insignificant or meritless,[47] this Court will not substitute its judgment for Schmidt's substantiated conclusion that Muldrow's job performance was unsatisfactory.[48]

---

[46] Muldrow admits that his record reveals a wide variety of alleged misconduct. *See* ECF No. 51 at 58 ("[N]one of [Plaintiff's] reprimands were for the same thing.").

[47] *E.g.*, ECF No. 51 at 41, 45.

[48] *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998), *aff'd*, 385 F. App'x 297 (4th Cir. 2010).

Muldrow has not shown that his performance met Schmidt's legitimate expectations at the time of termination.  Therefore, he has not established a prima facie case of disparate treatment under Title VII or § 1981.  *See White*, 375 F.3d at 295.

c. Nondiscriminatory Reasons and Pretext

Schmidt argues that, even if Muldrow did meet his prima facie burden, Schmidt has "articulated a legitimate non-discriminatory business reason for his termination," ECF No. 49-1 at 23, and that Muldrow "offers no evidence that Schmidt's decision to terminate his employment was a pretext for discrimination," *id*. at 24.  Muldrow "disagrees."  *See* ECF No. 51 at 52.

Schmidt has proffered a legitimate, nondiscriminatory reason for Muldrow's termination: several poor performance evaluations between 2008 and 2010.  *See generally* ECF No. 49-10, Ex. 8.[49]  Therefore, the burden returns to Muldrow to demonstrate that his work history was not the true reason for his termination, and that the true reason was intentional race discrimination.[50]  "While reviewing the employer's articulated reasons for discharge and the plaintiff's refutation thereof, we must keep in mind that Title VII is not a vehicle for

---

[49] *See also Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011).

[50] *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

substituting the judgment of a court for that of the employer."
*DeJarnette*, 133 F.3d at 298-99 (internal quotation marks
omitted).

Muldrow's arguments about pretext overlap considerably with
his argument that Schmidt's job expectations were illegitimate.
*See supra* Part II.C.1.b.i.  For instance, Muldrow alleges that
Schmidt contrived the April 29 early delivery violation "as a
pretext to cover-up its own race discrimination."  ECF No. 51 at
37.  In support, Muldrow argues that Schmidt has not produced a
copy of the policy or shown that Muldrow was aware of it.  *Id.*
at 37-38.  Muldrow also disputes the validity of the May 3
charge of delivery ticket falsification.  *Id.* at 39-41.
Finally, Muldrow argues that, if Schmidt truly intended to fire
him for the April 29 and May 3 violations, Sprenkle would have
indicated this before their afternoon meeting on May 4.  *See* ECF
No. 51 at 42.[51]  "Taken as a whole," Muldrow concludes, "these
points . . . are major problems . . . that completely undermine

----

[51] Muldrow emphasizes that Sprenkle's "malicious intentions" were
"very clear" when she made the decision to terminate him "as a
result of his making a claim of racial discrimination."  ECF No.
51 at 54-55.  Muldrow cites Sprenkle's testimony that she
decided to terminate Muldrow after learning about his complaint
against Windsor.  *Id.* (*citing* ECF No. 51, Ex. 4 at 17 (63:13-21;
64:1-14)).  But Sprenkle's decision to terminate Muldrow *after*
learning of his complaint is not evidence that she terminated
him *because* of it.  *See supra* Part II.C.1.a.  Contrary to
Muldrow's assertion, the distinction is not mere semantics.  ECF
No. 57 at 18.

[Schmidt's] explanation and create genuine disputes of material facts." *Id.* at 44.

"A plaintiff is entitled to a trial on the merits of a Title VII claim if he . . . establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination. . . ." *Darvishian v. Green*, 404 F. App'x 822, 828 (4th Cir. 2010). Muldrow has not carried this burden. Although Muldrow argues that he did not commit the charged violations--or that he should not have been terminated for their commission--this Court will not "sit as a kind of super-personnel department weighing the prudence of [Schmidt's] decisions." *DeJarnette*, 133 F.3d at 299 (internal quotation marks omitted).[52] Because Muldrow has neither established a

---

[52] Muldrow also argues that he has demonstrated such inconsisten-cies in Schmidt's proffered reasons for his termination that a reasonable fact-finder could find those reasons unworthy of credence. *Darvishian*, 404 F. App'x at 831. Muldrow refers to the differing testimony about whether Schmidt terminated Muldrow because of his history of infractions or because of the alleged violations on April 29 and May 3, 2010. *E.g.*, ECF No. 57 at 2, 5-6. Muldrow also emphasizes that Sprenkle decided to suspend him pending termination before Zinkand investigated Muldrow's claim against Windsor and before Muldrow lodged his complaint in person. ECF No. 57 at 13-14, 24, 25.

Muldrow fails to mention that, before he informed Schmidt of Windsor's alleged racial discrimination, Windsor had informed Schmidt of Muldrow's latest vendor violation. *See* ECF No. 51, Ex. 5 at 9 (31:1-21); *id.* at 10 (34:2-8). This refutes Muldrow's contention that his complaint--rather than Windsor's-- was the impetus for his suspension and termination. Moreover, Muldrow's alleged violation on May 4 followed alleged violations

prima facie case of disparate treatment nor rebutted Schmidt's legitimate, nondiscriminatory reason for his termination, Schmidt is entitled to summary judgment.

2. Retaliation: Count II

*McDonnell Douglas* applies to Title VII retaliation claims.[53] First, the plaintiff must establish a prima facie case of retaliation. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006). The burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse action. *See id.* The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by showing "*both* that the reason was false *and* that discrimination was the real reason for the challenged conduct." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (internal quotation marks omitted).

Schmidt argues that Muldrow cannot prove a prima facie case of retaliation or overcome Schmidt's legitimate, nondiscriminatory business reasons for his termination. ECF No. 49-1 at 29-34. Muldrow contends that he has established a prima facie case

---

on May 3 and April 29, which in turn followed a lengthy record of poor performance. ECF No. 49-10, Ex. 8; ECF No. 49-18, Ex. 16; ECF No. 49-19, Ex. 17. Muldrow's work history was so problematic that Sprenkle shared her intent to replace him on April 29. *See* ECF No. 49-18, Ex. 16.

[53] *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000).

of retaliation and shown that Schmidt's reasons for his termination are "a sham." *See generally* ECF No. 51 at 60-72.

    a. Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must establish that (1) he "engaged in a protected activity," (2) his employer acted adversely against him, and (3) "the protected activity was causally connected to the employer's adverse action." *Okoli*, 648 F.3d at 223 (internal quotation marks omitted).

Schmidt argues that Muldrow's retaliation claim fails because there is "no evidence of a causal connection between Muldrow's complaint and his termination." ECF No. 49-1 at 29.[54] Muldrow objects that the causal connection is established by Sprenkle's admission that Schmidt terminated Muldrow after learning about his complaint against Windsor. ECF No. 51 at 63. The facts are sufficient to establish causation. Muldrow was terminated on May 17, 2010--13 days after lodging a complaint for racist treatment by one of Schmidt's customers. *See* ECF No. 49-21, Ex. 19; ECF No. 51, Ex. 10 at 13. The temporal proximity of the complaint and his termination is "strongly suggestive of

---

[54] Schmidt concedes that Muldrow's complaint was "protected activity" and that Schmidt took an adverse employment action against him. ECF No. 49-1 at 29.

retaliatory motive and thus indirect proof of causation."[55]

b. Nondiscriminatory Reasons and Pretext

Schmidt argues that it has satisfied its burden to produce a nondiscriminatory basis for Muldrow's termination and that Muldrow has not demonstrated pretext. *See Laber*, 438 F.3d at 432; *Jiminez*, 57 F.3d at 378; ECF No. 49-1 at 31-34. Muldrow contends that he has shown pretext because Zinkand's investigation into his complaint was "a sham." ECF No. 51 at 66-73. In support of this conclusion, Muldrow argues that the investigation was not conducted at Schmidt's request, that Zinkand never interviewed Muldrow, and that Zinkand's loyalties were "blatantly tied to maintaining service to the customer [Royal Farms] as opposed to preventing discrimination in the workplace." ECF No. 51 at 66-72.[56]

As discussed above, Muldrow has not established that Schmidt's nondiscriminatory reasons for terminating him are a pretext for discrimination. The record shows that Zinkand conducted a good faith investigation of Muldrow's allegations.

---

[55] *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (*citing Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) ("While this proof far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.")).

[56] Muldrow also states that Windsor's written statement does not deny her use of the word "nigger," that Jarvis's account corroborates his claim, that Zinkand "failed to comply" with Schmidt's antiharassment policy, and that Zinkand did not have the authority to investigate. ECF No. 51 at 66-72.

Zinkand interviewed Windsor and Cremona at Royal Farms Store No. 15. ECF No. 49-4, Ex. 2 at 12. They reported that Muldrow became angry after Windsor told him she would be issuing a vendor violation. *Id.* at 12-13. Windsor denied having called Muldrow a "nigger." *Id.* at 13. Zinkand also interviewed the store manager at Royal Farms Store No. 29, where Muldrow had allegedly falsified a ticket the day before. *See* ECF No. 49-4, Ex. 2 at 14. She confirmed that neither she nor her employees had signed the ticket. ECF No. 49-16, Ex. 14 at 2; ECF No. 51, Ex. 5 at 47 (20-21). Muldrow was provided opportunities to reiterate his allegations at a meeting on May 4 and during his grievance hearing. ECF No. 49-3, Ex. 1 at 35 (385:10); ECF No. 49-3, Ex. 1 at 20 (161:15-18). Upon consideration of the evidence before it, Schmidt concluded that Muldrow was not credible. The law does not require more.[57]

---

[57] *See Amirmokri v. Abraham*, 266 F. App'x 274, 281 (4th Cir.) ("[I]t is largely irrelevant whether [Plaintiff] was, in fact, unprofessional or whether [the employer] should have believed his general denial. . . . [Relevant] personnel made these complaints, placing [the employer] in the position of having to deal with them. The only relevant question is whether [the employer]'s decisions were motivated by the desire to discriminate or retaliate, and there is nothing in the record that would support an inference that [the employer] disbelieved the accounts . . . yet used them as pretext for such a hidden motivation."), *cert. denied*, 555 U.S. 885 (2008); *see also Holland*, 487 F.3d at 220 ("Whether Holland actually made [physical threats to his employer] is irrelevant in this context because . . . the decisionmaker believed that he did. Title VII endeavors to eliminate workplace discrimination, but the statute

Although Muldrow has established a prima facie case of retaliation, he has not rebutted Schmidt's legitimate, nondiscriminatory reasons for its adverse employment action. Therefore, Schmidt is entitled to summary judgment.

3. Hostile Work Environment: Count IV

To survive an employer's motion for summary judgment on his claims of a racially hostile work environment, the plaintiff must show offending conduct that was (1) unwelcome, (2) based on his race, (3) "sufficiently severe or pervasive" so as to "alter [his] conditions of employment and create an abusive atmosphere," and (4) imputable to the employer.[58]  The elements are the same under Title VII or § 1981. *Spriggs*, 242 F.3d at 184.

Schmidt argues that Muldrow's hostile work environment claim fails because Windsor's alleged harassment was neither severe nor pervasive. ECF No. 49-1 at 34.  Schmidt also argues that Muldrow cannot impute the harassment to Schmidt because Schmidt did not act negligently. *Id.*[59]  Muldrow's cross motion and opposition does not address whether the harassment was

---

was not designed to strip employers of discretion when making legitimate, necessary personnel decisions.").

[58] *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001) (*citing Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)).

[59] Schmidt concedes that the alleged harassment by Royal Farms employee Windsor was unwelcome and based on Muldrow's race. ECF No. 49-1 at 34.

severe or pervasive. *See generally* ECF No. 51. However, Muldrow contends that the harassment is imputable to Schmidt. *Id.* at 64-66, 82-83.

a. Severe or Pervasive

The Court must consider all of the circumstances in determining whether the harassing conduct is "sufficiently severe *or* pervasive" to create a "hostile work environment." *Smith*, 202 F.3d at 242 (emphasis added). These circumstances include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Id.* The standard for proving an abusive work environment is "intended to be a very high one." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 776 (D. Md. 2010) (internal quotation marks omitted).

There is no genuine dispute of material fact that Windsor's alleged harassment was isolated. *See, e.g.*, ECF No. 49-3, Ex. 1 at 25 (256:13-14) ("Never had a problem in that store."). Therefore, even if the exchange occurred, Muldrow's claim could not succeed on the grounds of pervasiveness. However, if Muldrow's allegations are true, there is no doubt that the

harassment was "severe" and "humiliating."[60]   According to

Muldrow, Windsor "exploded," in a "loud and embarrassing tone":

"Who the fuck does this nigger think he's talking to? I'm not

checking in this nigger."   ECF No. 51, Ex. 1 at 67 (265:3-8).

Muldrow further alleges that Windsor refused to help him with

his inventory, which interfered with his work performance.

*Smith*, 202 F.3d at 242; ECF No. 51, Ex. 1 at 68 (269:4-11).

Windsor denied Muldrow's accusation.   ECF No. 49-4, Ex. 2 at 13.

The parties' differing accounts raise a genuine dispute of

material fact sufficient to survive summary judgment.

b. Imputable to Employer

The Fourth Circuit has not addressed whether an employer

can be liable under Title VII for the harassing conduct of

nonemployees.   However, other circuits have adopted a negligence

standard, "finding that an employer can be liable if it took no

steps to protect its employees and if it had actual or

constructive knowledge of the situation."   *EEOC v. Cromer Food

Servs., Inc.*, Nos. 10-1476, 10-1552, 2011 WL 733814, at *4 (4th

---

[60] *See Faragher v. City of Boca Raton*, 542 U.S. 775, 788 (1998)
(explaining that "isolated incidents (*unless extremely serious*)
will not amount to discriminatory changes in the 'terms and
conditions of employment'" (emphasis added)).   *But see Cosely v.
E.I. DuPont De Nemours & Co., Inc.*, No. Civ.A. 3:96CV1022, 1997
WL 856619, at *7 (E.D. Va. July 24, 1997) ("Although distaste-
ful, one incident of the utterance of a racial slur in
[plaintiff]'s sixteen years [with the employer] cannot by any
stretch of the imagination be construed to create an abusive
working environment."), *aff'd*, No. 97-2144, 1998 WL 112659 (4th
Cir. Mar. 16, 1998) (per curiam).

Cir. Mar 3., 2011); *see also id.* (adopting the negligence standard for the instant litigation).  Schmidt argues that it acted reasonably by conducting a good faith investigation into Muldrow's complaint regarding Royal Farms employee Windsor.  ECF No. 49-1 at 35-36.  Muldrow argues that Schmidt "took no steps to protect its employee."  ECF No. 51 at 64.  He asserts that Schmidt should have reassigned or transferred Muldrow instead of suspending him and concludes, without citation, that the "*sole*" purpose of Zinkand's inquiry was to gather support for Schmidt's decision to terminate.  ECF No. 51 at 65, 83.

Before May 4, 2010, Muldrow had not complained about Windsor.  *See, e.g.*, ECF No. 49-3, Ex. 1 at 25 (256:13-14) ("Never had a problem in that store.").  Immediately after learning of Muldrow's complaint, Zinkand traveled to the store where the incident occurred and interviewed Windsor and Cremona. ECF No. 49-4, Ex. 2 at 12, 19, 24.  Schmidt also secured a written statement from Jarvis, who initially reported that Muldrow's story was false.  ECF No. 51, Ex. 3 at 6 (21:13-21; 22:1-11).  As discussed above, Muldrow had two opportunities to share his allegations with Schmidt management: at a meeting on May 4 and during his grievance hearing.  ECF No. 49-3, Ex. 1 at 35 (385: 10); *id.* at 20 (161:15-18).  Muldrow's personal belief that Schmidt should have conducted a different or more thorough investigation is insufficient to establish negligence.

Muldrow has not shown that Windsor's harassment is imputable to Schmidt.   Therefore, he has not established a prima facie case of hostile work environment.   Schmidt is entitled to summary judgment.

III. Conclusion

For the reasons stated above, the Court will deny Muldrow's cross motion for summary judgment, deny as moot Muldrow's motion to strike, and grant Schmidt's motion for summary judgment.

___10/5/12___
Date

_____
William D. Quarles, Jr.
United States District Judge